UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

ROBERT ROMERO,                                :

                    Petitioner,        :        **REPORT AND**
                                                  **RECOMMENDATION**
      - against -                        :        **TO THE HONORABLE**
                                                    **PAUL A. CROTTY**
DAVID A. ROCK,                                :

                    Respondent.        :        08 Civ. 7791 (PAC)(FM)

----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED:_ 2/2/2010

I.    Introduction

      In this proceeding, pro se petitioner Robert Romero ("Robert") seeks

habeas relief following his conviction in Supreme Court, New York County, on two

counts of Murder in the Second Degree.  Robert was tried twice because the first jury was

unable to reach a verdict.  On March 12, 2002, Justice Leslie Crocker Snyder, before

whom the second month-long trial took place, sentenced Robert to two consecutive

sentences of twenty-five years to life, noting that the murders were, in essence, a street

level execution of one group of drug dealers by another group of drug dealers.  (S. 14).[1]

      In his petition ("Pet." or "Petition"), Robert advances several claims.  First,

Robert contends that his due process right to a fair trial was violated by the trial court's

---

[1]    "S." refers to the minutes of Robert's sentencing.  "Tr." refers to the trial
transcript.  "Ex." refers to the exhibits in the respondent's Appendix, which are also cited in the
Answer of Ass't Dist. Att'y Susan Gliner ("Gliner Affirm.").

improper admission of uncharged crime evidence and certain remarks made by the prosecutor in his summation.  (Pet. ¶ 13).  Second, Robert asserts that the trial court improperly imposed consecutive sentences for crimes that constituted part of the same criminal transaction.  (See id.).  Third, Robert maintains that his second trial violated his rights under the Double Jeopardy Clause of the Fifth Amendment.  (Id.).  Finally, Robert argues that the use of a bible during the swearing of trial witnesses infringed his rights under the Establishment Clause of the First Amendment.[2]  (Id.).

For the reasons that follow, I recommend that the Petition be denied. Additionally, because Robert has failed to make the substantial showing of the denial of a constitutional right required by 28 U.S.C. 2253(c)(2), a certificate of appeal should not be issued.

II.     Factual Background

A.     People's Case

Robert and three of his brothers – George, Julio, and Ubaldo (more commonly known, and henceforth referred to as "Edwin") – were tried together.  The proof introduced at the second trial against the four brothers (collectively, the "Romeros"), viewed in the light most favorable to the People, established as follows:

---

[2]     In his Petition, Robert also refers to the denial of his right to "equal protection of law."  (Id.).  Since none of his papers make any further reference to this claim, and there does not appear to be any factual or legal support for it, I have not addressed it in this Report and Recommendation.

1.    <u>The Shootings</u>

On the evening of November 1, 1990, Etienne Adorno ("Adorno"),

DeMetrio Flores ("Flores"), and Rafael Baez ("Baez") were parked in a blue Oldsmobile

on the east side of First Avenue between 117th and 118th Streets in Manhattan.  Adorno

was in the driver's seat, Flores was in the front passenger seat, and Baez was in the rear

seat.  (<u>Id.</u> at 738-39).  Adorno and Baez previously had been involved in a series of

robberies of drug dealers and others over the span of several months.  (<u>Id.</u> at 724, 726).

On this occasion, together with Flores, they hoped to steal drugs or money from the

Romeros, who ran a drug distribution business on that block.  (<u>Id.</u> at 450, 736, 1255).

(Among the Romeros' employees in the drug business were Raymond Alvarez

("Alvarez"), Frederick McBean ("McBean") and Wilson Cruz ("Cruz").  ( <u>Id.</u> at 1255,

1652, 1950-55)).  Baez was armed with a .380 automatic handgun, and Flores had a fake

.357 magnum handgun.  (<u>Id.</u> at 740-41).  While they were attempting to locate their

intended victims, Baez left the car to place a telephone call to his girlfriend.  (<u>Id.</u> at 746-

49).

The arrival of Adorno, Flores, and Baez did not go unnoticed by the

Romeros.  (<u>Id.</u> at 486, 1276).  Although the trial witnesses disagreed with respect to

certain details of the steps that the Romeros took after Adorno, Flores and Baez arrived

on First Avenue, Robert's girlfriend, Maria Martinez ("Martinez"), and Cruz both

testified that each of the Romeros and Cruz retrieved a firearm from a bag of weapons

and then crossed from the west to the east side of First Avenue, where Adorno and Flores remained seated in the blue Oldsmobile.  (Id. at 491-96, 1985-87).  Robert assumed a position in front of the vehicle near the passenger side, Edwin was near the front driver's side, and Cruz positioned himself on the driver's side between the front and rear doors. (Id. at 1990-94).  George and Julio stood behind Cruz.  (Id. at 1990).  Moments later, a fusillade of at least thirty-eight bullets was fired from at least two of the attackers' weapons.  (Id. at 328).  Adorno was struck twenty-one times and Flores eight times.  (Id. at 1411, 1442).  Baez, who was still outside the car as these events were unfolding, allegedly attempted to intervene using his own firearm,[3] but did not strike any of the persons firing at Adorno and Flores.  (Id. at 751-52).

When the gunfire stopped, the Romeros and Cruz fled from the scene.  (Id. at 1298, 1949).  At least two of the participants in the shooting escaped in a car that they hijacked at gunpoint.  (Id. at 250-52).

Both victims died as a result of multiple gunshot wounds.  (Id. at 154, 1410, 1441).  Although the shootings took place on a well-lit street, none of the bystanders, who included McBean, Martinez, and Alvarez, admitted that they had seen the shootings when the police initially investigated the case.  (Id. at 1790-92).  Without any eyewitnesses

---

[3]     No bullets or shell casings were recovered from the area from where Baez stood during the shooting.  (Tr. 328-29).  Accordingly, despite his testimony to the contrary, he may not have acted to defend Adorno and Flores.

assisting them, the police were unable to identify the persons responsible for Adorno's

and Flores' deaths for several years.

### 2.    Subsequent Events

A few days after the shootings, Robert threatened Martinez at knifepoint,

stating that he would kill her and members of her family if she ever disclosed anything

about the incident.  (Id. at 510).  Martinez heeded this warning until a date in 1992, when

Robert became enraged at Martinez's mother and her mother's boyfriend, Alberto Aponte

("Aponte").  Aponte previously had castigated Robert for failing to be sufficiently

attentive to Martinez's children.  (Id. at 1019).  During their earlier altercation, Robert

responded by warning Aponte not to bother him or he would "do to [him] . . . the same

thing [he] did to the guys on 118th Street and First Avenue."  (Id. at 1020, 1029).  On the

second occasion, Robert tied Martinez to a chair and then fired several shots from his

apartment window at Aponte and Martinez's mother who were on the street.  (Id. at 516-

18, 1023).  This prompted Martinez to contact the police.[4]  (Id. at 526, 530).

Despite Martinez's statements to the police, no charges were brought

against the Romeros in connection with the Adorno and Flores homicides.  The

investigation of the shootings was reinvigorated in 1999, however, after it was assigned to

Francis Connelly, a detective in the Manhattan District Attorney's Homicide Investigation

Unit.  (Id. at 2208-09).  Connelly soon secured the cooperation of Baez, who testified at

---

[4]    It appears that Robert was prosecuted as a result of the shooting incident.  (See
Ex. A at 20; Ex. B at 19).

trial that one of the shooters was Cruz (who was known to him as "Willie Green Eyes"), and that another was a person whom he identified at trial as "George," from a photograph which actually depicted Edwin.  (Id. at 753, 841, 2049, 2228).

Robert's role in the shootings was eventually confirmed at trial by four eyewitnesses:  Martinez, Alvarez, McBean, and Cruz, who pleaded guilty to one count of Manslaughter in the First Degree as a result of his role in the shootings.[5]  (Id. at 500-01, 1288-91, 1646-47, 1990-94).  Another area drug dealer, Tyrone Rich ("Rich"), testified that he saw Edwin running from the scene of the shooting with something that "looked like a [machine] gun" in his hands.[6]  (Id. at 1092-930).

B.      Defense Case

None of the Romeros presented a defense case.

E.      Conviction and Sentencing

On February 6, 2002, after deliberating for fewer than three days, the jury convicted both Robert and Edwin on two counts of Murder in the Second Degree, but

---

[5]      Cruz was only fourteen years old when the shootings occurred.  (Tr. 2032). Accordingly he faced a maximum aggregate sentence of eighteen years to life as a juvenile offender.  (Tr. 2041).  Pursuant to a cooperation agreement, the People agreed to recommend that he receive an indeterminate sentence of only one to three years.  (Tr. 2043).

[6]      Although Cruz at first minimized his own role, he told the police early on that Edwin had stated in his presence several times that "Nobody can fuck with me and my brother[.] Niggers known around here how we shot those two niggers up in the car on the corner." (Resp't Mem. at 43; Tr. 2009-11, 2024).  Alvarez similarly indicated to the police in his earliest statement that Robert and one of his brothers had shot at the victims' car.  (Resp't Mem. at 45-46).

acquitted George and Julio, on the same charges.  Thereafter, on March 12, 2002, Justice

Snyder sentenced Robert (and Edwin) to indeterminate sentences of twenty-five years to

life on each count, to be served consecutively.  (S. 15).

        D.     <u>Subsequent Procedural History</u>

        1.     <u>Direct Appeal and First Motion to Vacate Conviction</u>

On March 21, 2002, Robert's counsel filed a notice of appeal with the

Appellate Division, First Department.  Before that appeal could be perfected, however,

on or about December 30, 2003, Robert filed a <u>pro se</u> motion to set aside his judgment of

conviction under Section 440.10 of the New York Criminal Procedure Law ("CPL").

Robert contended that Justice Edwin Torres had improperly declared a mistrial at the end

of the first trial, and that Justice Snyder had made several erroneous evidentiary rulings.

(Ex. A).

On May 12, 2004, Justice Robert H. Straus denied Robert's motion

pursuant to CPL § 440.10(2)(b) because each of the issues Robert raised was record-based

and therefore could be raised as part of his direct appeal.[7]  (Ex. C).  Justice Straus further

concluded that Robert's claims were meritless.  With respect to the first trial, the Justice

observed that after three days of jury deliberations, an <u>Allen</u> charge, and a note from the

jury indicating they were hopelessly deadlocked, the trial judge properly concluded that

---

       [7]     CPL § 440.10(2)(b) provides that "the court must deny a motion to vacate a
judgment when . . . [t]he judgment is, at the time of the motion, appealable or pending on appeal,
and sufficient facts appear on the record with respect to the ground or issue raised upon the
motion to permit adequate review thereof upon such an appeal."

there was "no reasonable possibility the jurors could agree on a verdict."  (Id.).  Turning

to the evidentiary claims, Justice Straus held that Justice Snyder properly had admitted

evidence of Robert's abusive relationship with Martinez, involvement with the drug trade,

and nickname, "Crazy Rob," as background evidence to explain the relationships among

the witnesses, the defendants, and the victims, as well as why Martinez had failed to come

forward as a witness for so long after the shooting.  Justice Straus also concluded that the

probative value of this evidence outweighed its prejudicial effect, especially in light of

Justice Snyder's cautionary instructions to the jury.  (Id.).  Although Robert sought leave

to appeal Justice Straus' decision, the Appellate Division denied that application.  (Exs.

D, E).

        In September 2004, Robert's counsel perfected his direct appeal by filing a

brief with the Appellate Division.  (Ex. G).  In that brief, Robert argued that the

prosecution's case was legally insufficient and against the weight of the evidence.  (Id. at

61-62).  Robert also contended that his Fifth and Fourteenth Amendment due process

rights were violated by prejudicial statements made by the prosecutor in closing

argument, the trial court's failure to have a witness's prior inconsistent statement read

back in response to a jury note, repeated references to him using the nickname "Crazy

Rob," and the trial court's admission of evidence of prior crimes, i.e., domestic violence

against Martinez and the attempting shooting of Martinez's mother and Aponte.  (Id. at

68-85).

Robert also submitted a pro se brief to the Appellate Division, in which he objected to the admission of the evidence concerning his uncharged crimes, and further claimed that the trial court had violated the "provisions of Sandoval" and the Double Jeopardy Clause of the United States Constitution.  (Ex. H at 35, 42) (block capitalization omitted and underlining added).   Robert also contended that under New York law the two homicides comprised a single act, for which consecutive sentences could not be imposed.  (Id. at 45).  Like his counsel, Robert complained about the trial court's decision to allow the prosecutor to refer to him by his street nickname, "Crazy Rob."  (Id. at 79).

On October 11, 2005, the Appellate Division unanimously affirmed the convictions of Robert and Edwin.  People v. Romero, 804 N.Y.S.2d 8 (1st Dep't 2005). In its decision, the court first found that the guilty verdict was based on legally sufficient evidence and not against the weight of the evidence.  As the court observed, "[n]umerous witnesses inculpated the defendants."  Moreover, "the jury could have reasonably concluded that differences in [the witnesses'] perception and memory of details of this fast-paced, chaotic event accounted for the inconsistencies in their testimony."  Id.

Turning to the prosecutorial misconduct claim, the court held that the challenges were "largely unpreserved."  The court further noted that if it were to review these unpreserved claims, it would find that the statements made by the prosecutor in his summation "constituted fair comment on the evidence, made in response to defense

9

arguments and that, to whatever limited extent the remarks may have been improper, "the court's curative instructions effectively prevented any prejudice." Id. at 288.

The court further concluded that Justice Snyder "responded meaningfully to the jury's request for a read back of testimony," and did not prejudice Robert by declining to read back a related stipulation because she reminded the jurors of its existence and their right to request further readbacks, an invitation they declined to pursue. Id. Finally, the court stated that it had considered and rejected each of the defendant's other claims, including those in Robert's supplemental brief. Id.

The New York Court of Appeals initially denied Robert's leave application on December 29, 2005, but later reversed that ruling on March 29, 2006, after Robert moved for reconsideration because Edwin had been granted leave to appeal. (Gliner Affirm. ¶ 17 & Ex. L). Robert's appellate counsel then filed a brief in October 2006 which is notable for its extremely poor quality.[8] (See Ex. M). In that brief, Robert raised two claims: insufficiency of the evidence and an allegation that the prosecution's summation was unduly prejudicial. (Id. at 1). Thereafter, the court appointed new counsel for Robert and directed that further briefing occur by letter submission. (Gliner Affirm. ¶¶ 19, 20). In his letter-brief dated November 21, 2006, Robert's new counsel relied on the briefs submitted to the Appellate Division by Robert and Edwin, but stressed

---

[8]     Robert was represented at this stage by the same attorney who had been appointed to represent him before the Appellate Division. Unlike the brief submitted to the Court of Appeals, the brief submitted to the Appellate Division was more than adequate. (Compare Exs. G and M).

Robert's claim that the prosecutor's summation was improper.  (Ex. P).  Noting that

Robert was abandoning his weight-of-the-evidence claim because the Court of Appeals

had rejected it on October 21, 2006, in the course of denying Edwin's appeal, see People

v. Romero, 7 N.Y.3d 633 (2006), counsel indicated that the only question presented was

"whether the prosecution engaged in misconduct through comments, arguments and

analogies brought up by it during its summation."  (Ex. P at 1).

On December 19, 2006, the Court of Appeals affirmed Robert's conviction,

concluding, as had the Appellate Division, that most of his claims regarding the

prosecutor's summation were unpreserved because they had not adequately been raised at

trial.  People v. Romero, 7 N.Y.3d 911, 912 (2006).  Addressing a comment about

defense counsel that had elicited a timely objection that the prosecutor was attempting to

shift the burden of proof, the court held that it was not improper and was, in any event,

the subject of a curative instruction which properly stated that the People had the burden

of proving every element of each charged offense.  Id.  The court further concluded that

the prosecutor's reference to the cooperation of "Sammy the Bull" Gravano in an

unrelated federal case, viewed in the context of the entire summation, did not deprive

Robert of a fair trial since Justice Snyder sustained an objection to this "isolated" remark

and gave a curative instruction.  Id.

2.    Additional Applications for Collateral Review

On February 28, 2006, Robert filed a pro se application for a writ of error

coram nobis in the Appellate Division, claiming that his appellate counsel was ineffective

because he had failed to challenge Robert's consecutive sentences.  (Ex. S).  The

Appellate Division summarily denied this application on February 1, 2007.  (Ex. U).

On May 24, 2007, Robert again sought to set aside his conviction pursuant

to CPL § 440.10.  (Ex. V).  In this pro se motion, Robert reiterated the claims made in his

first motion to vacate the judgment of conviction and his pro se brief before the Appellate

Division.  (Id.).  Robert further claimed that his trial counsel was ineffective for failing to

object to the court's evidentiary rulings and that the swearing of witnesses using a bible

violated his rights under the Establishment Clause of the United States Constitution.  (Id.

at 18).

By order dated September 21, 2007, Justice Straus denied Robert's motion,

holding that his claims regarding the evidentiary rulings were procedurally barred because

they were record-based but had not been raised before the Court of Appeals on direct

appeal and had been rejected in connection with Robert's first Section 440.10 motion.

(Ex. X).  The Justice further held that Robert's ineffective assistance of counsel claim

was meritless because the trial transcript excerpts included in his motion papers showed

that his counsel had, in fact, "strenuously objected to the contested rulings."  Finally,

Justice Straus determined that Robert's remaining claims, including his claim regarding

the swearing of witnesses, were both procedurally barred and meritless.  (Id.).

On November 29, 2007, the Appellate Division denied Robert's request for

leave to appeal that decision.  (Gliner Affirm. ¶ 25).

Even before the Appellate Division had an opportunity to act, Robert filed a third motion to vacate his conviction, this time pursuant to CPL § 440.20.  (Ex. AA).  In this motion, dated October 2, 2007, Robert argued that the deaths of Adorno and Flores were part of a single criminal act, thereby precluding the imposition of consecutive sentences.  (Id.).  On December 20, 2007, Justice Straus, denied this motion "because the shooting of each of the two victims involved a separate and distinct act."  (Ex. BB).  On March 25, 2008, the Appellate Division denied Robert's application for leave to appeal this decision.  (Ex. DD).

3.      Habeas Petition

Robert timely filed his Petition on September 5, 2008.  In the Petition, Robert advances several claims.  First, Robert contends that his due process right to a fair trial was violated by the trial court's improper admission of uncharged crime evidence and certain remarks made by the prosecutor made in his summation.  (Pet. ¶ 13).  Second, Robert asserts that the trial court improperly imposed consecutive sentences for crimes that constituted part of the same criminal transaction.  (See id.).  Third, Robert maintains that his second trial violated his rights under the Double Jeopardy Clause of the Fifth Amendment.  (Id.).  Finally, Robert argues that the use of a bible during the swearing of trial witnesses infringed his rights under the Establishment Clause of the First Amendment.[9]  (Id.).

---

[9]      Robert also alleges for the first time in his reply papers that his rights were violated because his arraignment was delayed and he was denied an opportunity to testify before the grand jury.  (Aff. in Response of Resp't's Answer  ¶¶ 6-9, 16).  These claims were raised for

(continued...)

13

III.    Discussion

A.    Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Rather, a state prisoner seeking habeas relief must show that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner bears the burden of proving, by a preponderance of the evidence, that his rights have been violated.  Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), provides in part that:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –

---

[9](...continued)
the first time at a point where the People could not respond and therefore cannot be considered by the Court.  See, e.g., Salley v. Graham, No. 07 Civ. 455 (GEL), 2008 WL 818691, at *3 n.3 (S.D.N.Y. Mar. 27, 2008).  In any event, the appropriate remedy for excessive prearraignment delay is the suppression of any prejudicial statements made by the defendant during the period of delay.  See United States v. DeGregorio, 795 F. Supp. 630, 634 (S.D.N.Y. 1922).  Here, it does not appear that any statements that Robert made after his arrest but before his arraignment were introduced at trial.  Accordingly, any delay that may have occurred does not give rise to a federal constitutional claim.  Furthermore, as the Supreme Court has noted, the Fifth Amendment right to a grand jury proceeding does not apply to the states.  Alexander v. Louisiana, 405 U.S. 625, 633 (1972).  Any errors in state grand jury procedure that may have occurred consequently do not entitle Robert to federal habeas relief.

> (1) resulted in a decision that was <u>contrary to</u>, or involved an
> <u>unreasonable application of</u>, clearly established Federal law,
> as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in <u>Jones v. Stinson</u>, the Supreme Court has "construed the amended statute so as to give independent meaning to 'contrary [to]' and 'unreasonable.' Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." 229 F.3d 112, 119 (2d Cir. 2000) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000)). Under the "unreasonable application" clause, a federal habeas court should "ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams</u>, 529 U.S. at 409. This standard does not require that reasonable jurists would all agree that the state court was wrong. <u>Id.</u> at 409-10. Rather, the standard "falls somewhere between 'merely erroneous and unreasonable to all reasonable jurists.'" <u>Stinson</u>, 229 F.3d at 119 (quoting <u>Francis S. v. Stone</u>, 221 F.3d 100, 109 (2d Cir. 2000)).

Section 2254(d)(2) further authorizes the federal courts to grant a petition for a writ of habeas corpus when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and that "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail." Williams, 529 U.S. at 389.

B.     Robert's Evidentiary Claims are
       Unexhausted and Procedurally Forfeited

Robert's Petition may not be granted unless he has exhausted all available state court remedies, or there is an absence of state corrective process, or circumstances render that process ineffective to protect his rights.  See 28 U.S.C. § 2254(b)(1)(A)-(B). As a defendant charged with crimes in New York State, Robert unquestionably had an effective process available to him through the existing state statutes governing appeals. See N.Y. Crim. Proc. Law §§ 450.10 (direct appeal to Appellate Division as of right), 440.15 (discretionary appeal to Appellate Division from denial of motion to vacate judgment), 450.90 (discretionary appeal from adverse Appellate Division ruling). Therefore, to satisfy the exhaustion requirement with respect to a particular federal claim, Robert must show that he presented the substance of "the same federal constitutional claim[] . . . to the highest court in the . . . state." Aparicio v. Artuz, 269 F.3d 78, 89-90 (2d Cir. 2001) (internal citations and quotation marks omitted).

16

"A federal constitutional claim has not been fairly presented to the [s]tate courts unless the petitioner has informed those courts of 'all of the essential factual allegations' and 'essentially the same legal doctrine he asserts in his federal petition.'" Strogov v. Att'y Gen. of N.Y., 191 F.3d 188, 191 (2d Cir. 1999) (quoting Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 191-92 (2d Cir. 1982)).  To meet this requirement, it is not necessary that the federal constitutional claim be presented to the state courts in haec verba.  Rather, there are a number of ways in which the claim may be presented, including:

> [1] reliance on pertinent federal cases employing constitutional analysis, [2] reliance on state cases employing constitutional analysis in like fact situations, [3] assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and [4] allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Daye, 696 F.2d at 194.

Here, Robert raised his evidentiary claims in his first Section 440.10 motion, which Justice Straus denied, in part, because they could have been asserted in connection with his yet-to-be-filed direct appeal.  (Exs. A, C).  Thereafter, in his pro se brief to the Appellate Division, Robert reasserted those claims on direct appeal.  (Ex. H).  However, neither he nor his appellate counsel sought leave to appeal to the Court of Appeals on the basis of those alleged evidentiary errors after the Appellate Division affirmed his conviction.  Robert therefore failed to present his evidentiary claims to New

York's highest state court, the Court of Appeals.  His evidentiary claims consequently are unexhausted.

A federal court presented with unexhausted habeas claims may, in appropriate circumstances, either stay the petition or dismiss it without prejudice so that the petitioner can return to state court to pursue exhaustion.  See Rhines v. Weber, 544 U.S. 269, 276-77 (2005); Zarvela v. Artuz, 254 F.3d 374, 380-81 (2d Cir. 2001).  In connection with this proceeding, however, that would be a futile exercise.  Robert forfeited review by the Court of Appeals on these claims by failing to comply with state procedural rules governing when to raise them.  Although Robert did not exhaust his evidentiary claims as part of his direct appeal, he later presented those claims to the trial court through his second Section 440.10 motion.  (Ex. V).  In his decision denying that motion, Justice Straus held that Robert's evidentiary claims were procedurally barred because they were record-based claims that could have been (but were not) raised as part of Robert's application seeking leave to appeal to the Court of Appeals.  (See Ex. C at 1).  Justice Straus further determined that Robert's claim that trial witnesses were improperly sworn was procedurally barred for failure to raise it as part of his direct appeal.  (Id. at 2).  The Justice's decision with respect to these claims thereafter became final when the Appellate Division denied Robert's application for leave to appeal on November 29, 2007.  (See Gliner Affirm. ¶ 25).  Thus, permitting Robert to return to the Court of Appeals to exhaust these claims would not result in any relief and they should be deemed exhausted for the purpose of this Petition.

18

In addition, a federal court is precluded from reviewing a habeas claim where, as here, the state court's prior denial of that claim rested on an adequate and independent state ground.  E.g., Harris v. Reed, 489 U.S. 255, 262 (1989); Wainwright v. Sykes, 433 U.S. 72, 81 (1977).  A procedural default qualifies as such an adequate and independent state ground, Harris, 489 U.S. at 262, unless the petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. 722, 750 (1991); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996); accord Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000).

To establish cause for a default, a petitioner must adduce "some objective factor external to the defense" which explains why he did not raise the claim previously. Murray v. Carrier, 477 U.S. 478, 488 (1986); Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991).  The circumstances giving rise to cause include: (a) interference by government officials which makes compliance impracticable; (b) situations in which the factual or legal basis for a claim was not reasonably known by counsel; and (c) ineffective assistance of counsel.  See Murray, 477 U.S. at 488; see also Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994).  A showing of prejudice requires a petitioner to demonstrate that the failure to raise the claim previously had a substantial injurious effect on the petitioner's case such that he was denied fundamental fairness.  Reyes v. New York, No. 99 Civ. 3628 (SAS), 1999 WL 1059961, at *2 (S.D.N.Y. Nov. 22, 1999).  Finally, to

establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent." Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001). As the Supreme Court has indicated, the "miscarriage of justice exception is concerned with actual as compared to legal innocence." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Sawyer v. Whitley, 505 U.S. 333, 339 (1992)). A claim of actual innocence therefore must be supported by "new reliable evidence." Schlup v. Delo, 513 U.S. 298, 324 (1995). For this reason, "claims of actual innocence are rarely successful." Id.

It follows that Robert's evidentiary claims are procedurally barred unless he can demonstrate either cause and prejudice or a fundamental miscarriage of justice. In his papers, Robert does not make any of the showings necessary to overcome his procedural default. Indeed, the only suggestion that he makes along these lines is that his trial counsel was ineffective for failing to object to the evidence that he contends was improperly presented to the trial jury. However, as Justice Straus correctly found, Robert's trial counsel had, in fact, strenuously objected to several of the contested evidentiary rulings. (See Ex. X at 2). Accordingly, this Court lacks jurisdiction to consider Robert's evidentiary claims.

C.    Merits

Although a federal judge reviewing a habeas petition need only address claims that are exhausted and not procedurally barred, it is understandable that an inmate such as Robert, who is serving a lengthy sentence, would want the merits of his claims to be reached. Moreover, there is always the possibility (however remote) that another court

might reach a different conclusion concerning the threshold issues of exhaustion and procedural forfeiture.  For these reasons, I have considered all of the claims raised in Robert's Petition on the merits.  As shown below, none of those claims warrants habeas relief.

### 1.   Evidentiary Claims

In his Petition, Robert challenges several of the trial judge's evidentiary rulings regarding prior uncharged crimes, alleging that they allowed the prosecution to obtain a propensity conviction.[10]  (Pet. ¶ 13).  Although the Petition is devoid of details, Robert's first Section 440.10 motion argued that Justice Snyder violated his due process right to a fair trial by allowing the prosecution to introduce evidence about his involvement in narcotics trafficking, his alleged abuse of Martinez, and his attempted shooting of Martinez's mother and Aponte.  (See Ex. A).  Robert also complained about testimony concerning his use of the nickname "Crazy Rob."  (See id.; see also Ex. V (second Section 440.10 motion characterizing the alleged failure to object to these errors as ineffective assistance of trial counsel)).

Justice Straus rejected Robert's evidentiary claims on procedural grounds, but also concluded that the evidence concerning Robert's abusive relationship with

---

[10]      Robert also challenges the trial court's Sandoval ruling under the same theory.  In People v. Sandoval, 34 N.Y.2d 371, 364 (1974), the New York Court of Appeals held that a judge may rule in advance of trial with respect to the prosecution's use of prior convictions or misconduct to impeach a defendant's credibility.  However, because Robert did not take the stand, he could not be impeached with his prior convictions, no matter how the court ruled during the Sandoval hearing.  Therefore, he lacks standing to pursue a Sandoval claim.  See, e.g., McEachin v. Ross, 951 F. Supp. 478, 481 (S.D.N.Y. 1997).

Martinez and attempted shooting of her mother and Aponte was properly received, subject to a cautionary instruction, "as background evidence to explain Robert's relationship with Martinez and her failure to come forward prior to April 1992." (Ex. C at 2). Justice Straus similarly found that the trial testimony concerning the Romeros' involvement with drugs was properly admitted, subject to another cautionary instruction, as "background evidence" and because it was "inextricably interwoven with the motive for the[] homicides." (Id. at 3). Finally, the Justice held that it was proper to allow Rich to testify that Robert's nickname was "Crazy Rob" as background evidence and to explain Rich's relationship with Robert. (Id.).

Thereafter, Robert reiterated his evidentiary claims in the pro se brief that he filed with the Appellate Division. (Ex. H). The Appellate Division did not specifically address those claims, but stated at the conclusion of its decision that it had "considered and rejected" each of Robert's remaining claims, including those contained in his pro se supplemental brief. Romero, 804 N.Y.S.2d at 10.

It generally is "not the province of a federal habeas court to reexamine state-court determinations on state-law questions," Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), because, "[g]enerally, rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of a constitutional violation." Copes v. Schriver, No. 97 Civ. 2284 (JGK), 1997 WL 659096, at *3 (S.D.N.Y. Oct. 22, 1997); accord Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983). Robert consequently must show that any alleged evidentiary error at trial was "of constitutional dimension" and

22

deprived him of "fundamental fairness." Rosario v. Kuhlman, 839 F.2d 918, 924 (2d Cir.

1988); see also McCray v. Artuz, No. 93 Civ. 5757 (LBS), 1994 WL 603057, at *2

(S.D.N.Y. Nov. 3, 1994) (habeas relief warranted only where petitioner demonstrates that

the state evidentiary error was of "constitutional magnitude").  For an evidentiary error to

rise to this level, it must have had a "substantial and injurious effect or influence in

determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623, 637 (1993)

(quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  Stated somewhat

differently, the evidence "must have been 'sufficiently material to provide the basis for

conviction or to remove a reasonable doubt that would have existed on the record without

it.'"  Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (quoting Johnson v. Ross, 955

F.2d 178, 181 (2d Cir. 1992)).

a.      Prior Crimes

Robert's first contention is that Justice Snyder's decision to admit evidence

of several prior crimes – namely, his involvement with narcotics, abuse of Martinez, and

attempted shooting of Martinez's mother and Aponte – deprived him of a fair trial.  Under

both federal and New York law, evidence of prior crimes may not be admitted solely to

show that a defendant has a propensity for criminal activity.  See Fed. R. Evid. 404(b)

("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a

person in order to show action in conformity therewith."); People v. Rojas, 97 N.Y.2d 32,

36 (2001) ("[A] criminal case should be tried on the facts and not on the basis of a

defendant's propensity to commit the crime charged.").  On the other hand, both

jurisdictions permit uncharged crimes evidence to be introduced when it is relevant to an issue other than criminal propensity.  See United States v. Gelzer, 50 F.3d 1133, 1139 (2d Cir. 1995) ("Rule 404(b) does not bar all other crime evidence; it bars only the admission of a defendant's uncharged crimes to prove propensity to commit the crime charged.") (internal quotation marks omitted); People v. Allweiss, 48 N.Y.2d 40, 47 (1979) ("When evidence of uncharged crimes is relevant to some issue other than the defendant's criminal disposition, it is generally held to be admissible on the theory that the probative value will outweigh the potential prejudice to the accused."); People v. Molineux, 168 N.Y. 264, 293 (1901) (describing the so-called "MIMIC" exceptions to the proscription against the use of other crimes evidence); see also Rojas, 97 N.Y.2d at 37-38 (the Molineaux exceptions are illustrative, not exhaustive, and a jury may consider defendant's prior crimes as bearing on credibility).  Furthermore, under New York law, such evidence may be received when it is "inextricably interwoven" with the narrative of the crime charged in the indictment.  See People v. Vails, 43 N.Y.2d 364, 368-69 (1977); People v. Godbold, 864 N.Y.S.2d 425 (1st Dep't 2000).

As Justice Straus correctly noted, the testimony regarding the narcotics trafficking activities of the Romeros, including Robert, was essential so that the prosecutor could explain why these brazen killings occurred.  It also served to explain, inter alia, why Cruz helped the Romeros commit the murders.  "Because the prior misconduct evidence was relevant to establish . . . motive, the admission of that evidence did not deprive [Robert] of due process and a fair trial."  Damato v. Murphy, 641 F. Supp.

2d 143, 153-54 (D. Conn. 2009) (citing Rule 404(b)); see also Bernard v. Stinson, No. 97 Civ. 1873 (KTD), 1998 WL 40201, at *3 (S.D.N.Y. Jan. 30, 1998) (holding that Justice Snyder properly admitted evidence of defendants' involvement in a drug gang in a multiple homicide case).

The evidence of Robert's repeated abuse of Martinez and attempted shooting of her mother and Aponte similarly was relevant to explain why Martinez delayed coming forward from the date of the shootings until April 1992.  Indeed, as the respondent correctly notes, both at trial and on appeal, Robert addressed Martinez's motive for testifying, suggesting that she testified only because the police had "threatened her with the loss of her children if she did not give them the testimony they wanted about Robert."  (See Resp't's Mem. at 57 (citing Ex. G at 66; Tr. 2453 (referring to the "[p]rosecutorial myth" that witnesses failed to come forward out of fear of "one or more of the defendants"))).  Martinez's testimony and that of Aponte was relevant to counter defense counsels' suggestions regarding Martinez's motives for belatedly inculpating Robert.[11]

Moreover, Justice Snyder clearly instructed the jury that the evidence regarding Robert's other  crimes could be used only for limited purposes.  For example,

---

[11]     Aponte also testified about an incident in which Robert had threatened him.  (Tr. at 1020, 1029).  In that threat, Robert impliedly admitted his involvement in the killing of Adorno and Flores, warning Aponte that he would respond in the same manner as he had in response to "the guys on 118th Street and First Avenue."  (Tr. 1029).  Although the testimony about this threat arguably constituted evidence of yet another uncharged crime, it also was an implied admission of guilt with respect to the Adorno and Flores murders and hence was properly admitted.  See People v. Maerling, 46 N.Y.2d 289, 297 (1978).

when the People began to introduce evidence regarding the Romeros' drug trafficking, Justice Snyder cautioned the jurors that the evidence was being received "simply as background and as a necessary part of [their] understanding [of] the events actually charged" and reminded them that there were no drug charges against the Romeros.  (Tr. 451).  Justice Snyder similarly interrupted Martinez's testimony concerning Robert's abuse of Martinez to give the jury a limiting instruction.  (Id. at 525).  While those instructions were somewhat off-the-cuff, the Justice refined her message over time, telling the jury as part of her final instructions that:

> . . . I want to remind you of the cautionary or limiting instructions I've given you throughout the course of the trial, As you well know, the defendants are not on trial for any drug-related crimes or any drug crimes and I've allowed the mention of drugs, drug dealing, drug activities for only certain very limited reasons.
>
> That evidence was permitted, first of all, as to the background of the case; second of all, to allow the prosecution to place the events alleged here within a logical and meaningful context, to give you the background of what occurred on that date; and also to show any relationship that may have existed and what they were between various individuals and the defendants.  You determine what they were, of course, allegedly involved in the charges here.
>
> So that evidence was important for those reasons and allowed in only for those reasons.
>
> There was also some limited evidence permitted as to Robert Romero; that he had been involved with Maria.  Your recollection controls.
>
> But what is important, again, is the same rational[e] that was only allowed in for, to supply the nature of the relationship or the context or background of any charges here.

26

> You'll evaluate it for that and utilize it as you choose, but only for those limited purposes that I have indicated.
>
> You may not use any of this drug-related or any domestic violence evidence for any other purpose[s] than those which I have now indicated.  Please remember that.

(Tr. 2671-72).[12]

As a matter of law, the jury must be presumed to have followed Justice Snyder's instructions concerning the limited use that it could make of the other crimes evidence.  See Spencer v. Texas, 385 U.S. 554, 562-63 (1967); Herring v. Meacham, 11 F.3d 374, 378 (2d Cir. 1993) (citing Greer v. Miller, 483 U.S. 756, 766 n.8 (1987));  see also Kanani v. Phillips, No. 03 Civ. 2534 (PKC) (AJP), 2004 WL 2296128, at *19 (S.D.N.Y. Oct. 13, 2004) (no unfairness when "the trial judge gave a very specific limiting charge to the jury to ensure that jurors considered information about the uncharged crimes only for appropriate purposes"); Green v. Herbert, No. 01 Civ. 11881 (SHS) (AJP), 2002 WL 1587133, at *16 (S.D.N.Y. July 18, 2002) (prior crimes evidence did not deprive petitioner of a fair trial in light of judge's limiting instructions).

In any event, even if the Court could second-guess the efficacy of Justice Snyder's limiting instructions, the Supreme Court has yet to establish clearly "when the admission of prior crimes under state evidentiary laws can constitute a federal due process violation."  Allaway v. McGinnis, 301 F. Supp. 2d 297, 300 (S.D.N.Y. 2004) (citing Estelle, 502 U.S. at 67-68); accord Warren v. Napoli, No. 05 Civ. 8438 (CM) (KNF),

---

[12]      None of the Romeros objected to this charge or sought further instructions. (See id. at 2700-05).

2009 WL 2447757, at *11 (S.D.N.Y.  Aug. 10, 2009); <u>Parker v. Woughter</u>, No. 09 Civ.

3843 (GEL), 2009 WL 1616000, at *2 (S.D.N.Y. June 9, 2009) ("[P]etitioner cites no

Supreme Court case, and the Court is aware of none, holding that the admission of

evidence of uncharged crimes violates the Due Process Clause of the Fourteenth

Amendment.").  It follows that Justice Snyder's decision to admit the evidence subject to

limiting instructions cannot be said to be "contrary to" or an "unreasonable application

of" clearly-established federal law.  <u>See</u> Williams, 529 U.S. at 412-13.

        b.     <u>Use of Nickname</u>

The other evidence upon which Robert bases his evidentiary claim is Rich's

testimony that Robert was known on the street as "Crazy Rob."  Rich was approximately

fourteen years old when he met Robert.  (Tr. 1071).  As he explained, at that time, Robert

had acquired the nickname because he was "just doing crazy, stuff, you know, buildings

and stuff like that, playing in the park, mess with each other, you know, things like that."

(<u>Id.</u>).  This testimony arguably was relevant because it tended to prove that Rich had

known Robert for a considerable period of time.  While it might have been better to

exclude Rich's testimony about Robert's appellation, <u>see</u> <u>Regaldo v. City of Chicago</u>, No.

96 C 3634, 1998 WL 919712, at *4 (N.D. Ill. Dec. 30, 1998) (witnesses instructed to use

defendant's proper name, rather than his nickname "Crazy Joey"), it related to conduct

which was totally innocuous.  The mere introduction of this evidence therefore could not

have been so prejudicial as to provide a basis for the jury to convict Robert or remove a

reasonable doubt that otherwise would have existed.  It follows that the prosecution's

introduction of evidence concerning Robert's use of the nickname "Crazy Rob" does not

entitle him to habeas relief.  Cf. United States v. Peterson, 168 F. Supp. 2d 51, 55-56

(E.D.N.Y. 2001) (declining to strike references to defendant as "Crazy Billy" in

indictment because trial witnesses would identify him by that name and testify that they

did not know his last name).

 2. Prosecutorial Misconduct Claim

Robert's Petition does not specifically refer to the prosecutor's summation.

Nevertheless, on appeal, Robert alleged that several comments made by the prosecutor in

summation were objectionable.  Both the Appellate Division and the New York Court of

Appeals found that many of Robert's objections were unpreserved.  (Ex. K at 2; Ex. R at

1).  Both courts further concluded that the prosecutor's remarks did not deprive Robert of

a fair trial, especially in light of Justice Snyder's curative instructions.  (Id.).  In this

proceeding, Robert has not shown as he must that the state court's rejection of his

prosecutorial misconduct claim was contrary to, or constituted an unreasonable

application of, clearly established federal law.

As the Supreme Court has noted, a claim of prosecutorial misconduct

during summation requires a court to consider "whether the prosecutors' comments 'so

infected the trial with unfairness as to make the resulting conviction a denial of due

process.'"  Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v.

DeChristoforo, 416 U.S. 637, 643 (1974)).  The issue is not simply whether the

prosecutor's comments were "undesirable or even universally condemned."  Id.

Accordingly, a mere showing of prosecutorial misconduct does not entitle a petitioner to habeas relief. Bentley v. Scully, 41 F.3d 818, 824 (2d Cir. 1994). Rather, there must be a showing that the petitioner "suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." Id. In determining whether the petitioner suffered such prejudice, a court must consider: "(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether the conviction was certain absent the prejudicial conduct." Id. (citing Gonzalez, 934 F.2d at 424).

Robert first complains that the trial court improperly allowed the prosecutor to appeal to the juror's concern for community safety. (See Ex. P at 3). In the course of describing the shootings of Adorno and Flores, the prosecutor first noted, over defense counsel's objection, that "[b]ullets were flying everywhere on First Avenue. Anybody could have been killed, innocent bystanders, children." (Tr. 2566). Continuing in the same vein, he went on to state that "Anybody could have been killed when they let loose, anybody." (Id.). While these remarks at first blush may seem excessive, the prosecutor's subsequent statements reveal his true objective, which was to urge the jurors not to treat the killings less seriously simply because the victims may have been "two bad people," but, rather, to give the case "the same regard and . . . the same serious deliberations" that they would if the victims had been "scientists or paralegals." (Id. at 2566-67). Viewed in this context, it is clear that the remarks were not unduly prejudicial.

30

Robert also objected on appeal to certain of the prosecutor's remarks concerning defense counsels' cross-examinations of the People's witnesses.  Specifically, in the course of his summation, the prosecutor observed:

> This courtroom is an arena.  It is an arena of words.  It is an arena of words occupied by lawyers; some very good; some not so good.  All four of them are excellent, world champion lawyers in the arena of words.
>
> * * *
>
> The lawyers cross-examined the witnesses in expert fashion, expert, in this are[na] of words, and thse guys are all heavy weight contenders.  They have what it takes.
>
> And in comparison, the witnesses here are like the ninety-eight pound weakling on the beach, who has the sand kicked in their faces.
>
> But if you were to [turn] this situation around and put the lawyers in the arena of the streets, where robbery, drug dealing, murder and mayhem are the norm, as it is with many of my witness[es], it would be a little difficult for them, wouldn't it?  The lawyers may [not] do as well in that arena of the streets as they do in the arena of words.  It would be like dropping somebody into Kand[a]har all of a sudden.

(Id. at 2579-81).  Relating this rhetoric to the actual trial, the prosecutor cited as an example defense counsels' inquiries into whether witnesses "recalled being asked [a] series of questions and giving [a] series of answers in a prior proceeding."  (See id. at 2581).

A summation need not be "such [a] detached exposition as would be appropriate in a lecture."  United States v. Wexler, 79 F.2d 526, 530 (2d Cir. 1935) (L.

Hand, J.).  Here, the prosecutor simply was trying to advance the argument that his witnesses – some of whom had serious limitations – were no match for skilled defense counsel.  (See Tr. 2581).  This observation did not shift the prosecution's burden and was entirely proper.

The prosecutor also pursued this theme during his discussion of Martinez. As he stated:

> Remember when Maria Martinez testified there was a room full of children here [observing the trial]?
>
> How do think about that, a room full of children, not grown-ups like us?  These were children.
>
> Oh, Ms. Martinez, when was it that you were dealing drugs with Robert?
>
> Oh, Ms. Martinez, how many illegitimate children did you have?
>
> How do you think she feels up there, like a champ?
>
> You think it's nice to be up there, first of all with [the other prosecutor] going through all that and the four championship lawyers doing it to her with a room full of kids?
>
> * * *
>
> Did you notice what Maria Martinez looked like in here?  She was horrified to be sitting there with these four heavy-weight champions cross-examining her.

(Id. at 2573, 2608).

When co-counsel objected to the last of these comments on the ground that it urged burden shifting, Justice Snyder immediately reminded the jury that "the People have the burden of proving each and every charge and every element of every charge." (Id. at 2608).  Accordingly, even if one were to assume that the prosecutor's statements concerning the cross-examination of Martinez constituted improper comment – itself a dubious proposition – any possible prejudice was ameliorated by the trial judge's prompt curative instruction, which the jurors must be presumed to have followed.   See, e.g., Greer, 483 U.S. at 766 n.8 ("We normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it"); United States v. Colombo, 909 F.2d 711, 715 (2d Cir. 1990) ("[W]e presume that a jury adheres to the curative instructions of the trial court."); United States v. Pforzheimer, 826 F.2d 200, 205 (2d Cir. 1987) ("[It is] a fundamental proposition that a jury is presumed to follow the instructions of the trial judge.").

Robert also objects to two references to Sammy "The Bull" Gravano during the prosecutor's summation.  The first such statement responded to a remark made during summation by Edwin's counsel.  McBean, one of the eyewitnesses to the shootings, had testified that he first went to the police after he had a physical altercation with Edwin arising out of a dispute between Edwin and McBean's girlfriend.  At the time, McBean inculpated Edwin and Julio in the shootings because he was "highly pissed off at them," but he did not disclose Robert's role.  (Tr. 1305-12).  McBean testified that Edwin subsequently confronted him, saying "'I heard you went to the cops and told about the

shooting,'" and then "pulled out a Nine and said 'I should shoot you right now.'"  (Id. at 1312-14).  According to McBean, Edwin and George approached him a few days later, ostensibly to discuss the possibility that he might work for them again, but soon began discussing out loud which of them should "do it" to the "snitch,"  (Id. at 1314-16). Shortly thereafter, McBean moved out of the neighborhood.  (Id. at 1317).

In his summation, Edwin's counsel argued that "if, in fact, Edwin was involved in [the] shooting and if, in fact, Edwin thought Fred McBean had gone to the police to name him, don't you think something would have been done to Fred McBean, not just threaten him and let him walk away?"  (Id. at 2372).  Responding to that argument, the prosecutor noted:

> You know, Edwin Romero and Robert Romero should not get a benefit because they were dumb enough – and I'm not insulting them, but that word has been thrown around a lot – because they were silly enough to insult and humiliate a person that knew about their criminal activity.  Okay.  That is exactly what happened.  Edwin Romero humiliated Fred McBean.

 (Id. at 2622).  The prosecutor then analogized what Edwin had done to what John Gotti, Sr. had done in relation to Sammy "the Bull" Gravano, namely, disparaging him during conversations that later were introduced into evidence at their joint trial, causing Gravano to "flip" and become a "rat."  (Id.).  Refuting Edwin's counsel's argument, the prosecutor observed:

> Now, the fact that John Gotti was dumb enough to insult Sammy The Bull behind Sammy The Bull's back does

not mean Sammy The Bull was lying when he told . . . the
jury about John Gotti.

I hope that's a little less circular than it sounded.

(Id. at 2623).

Robert contends that this argument was objectionable, but none of the four

defense counsel voiced any concern about it as it was being advanced.  Their silence is

understandable since the prosecutor was simply trying to argue that the mere fact that

Edwin and George had threatened McBean did not suggest that they were not participants

in the shooting, as Edwin's counsel had intimated.  While the argument perhaps could

have been made without referring to the prosecution of John Gotti, Sr., the mere fact that

the prosecutor chose a colorful analogy does not mean that Robert was prejudiced.

Indeed, Robert was not one of the persons alleged to have threatened McBean.[13]

The prosecutor made a second reference to Sammy the Bull a little later in

his remarks when he was commenting about the relatively light sentence that Cruz had

received for his role in the shootings as a result of his cooperation.  At that time, the

prosecutor stated:

Okay, Sammy the Bull decides to cooperate.  How
many people did he kill, sixteen?

The big, bad Federal Government gave him four years.
The United States of America, your country, four years for
killing sixteen people to cooperate.

---

[13]     When the prosecutor mentioned Robert in the course of this argument, he
evidently was referring to the threats that Robert had made to Aponte.

How does that compare to Wilson Cruz?

(Id. at 2637-38).  When counsel objected to this line of argument, Justice Snyder

sustained the objection, noting that "We are not trying Sammy the Bull."  (Id. at 2638).

Shortly after the prosecutor concluded his summation, Justice Snyder elaborated upon her

ruling, instructing the jury:

> [A]lthough it's certainly entertaining to hear about
> Sammy the Bull and John Gotti and other characterizations,
> such as chowderhead, during the summations of the defense
> and primarily the prosecution's arguments, perhaps, obviously
> you know that John Gotti is not on trial here.  Sammy the Bull
> is not . . . on trial here.  The four Romeros are on trial here.
>
> And as I'll be telling you over and over, each
> defendant has to be considered separately.
>
> So, if anything, I don't believe there was any intended
> analogy, it was used simply as part of an argument that was
> made – that's for you to determine, not me – but keep in mind
> who is on trial here and that the prosecution always has the
> burden of proving each and every element of each crime
> charged as to any defendant who is on trial, as we'll be
> discussing, and take any arguments about John Gotti and
> Sammy the Bull in the light in which they were meant, which
> is not to analogize any defendant to them but to use it as
> something that keeps you awake and interested in the point
> that actually refers to this particular trial.

(Id. at 2658).

Here, again, the jury must be presumed to have followed the trial court's

curative instruction.  See, e.g., Greer, 483 U.S. at 766 n.8; Colombo, 909 F.2d at 715;

Pforzheimer, 826 F.2d at 205.  Moreover, it seems clear that the remarks of the prosecutor

could not have had the overwhelmingly prejudicial effect that Robert ascribes to them since two of the four defendants were acquitted despite the prosecutor's statements.

   Robert also objects to a portion of the prosecutor's summation in which he lamented a system of "turnstile" criminal justice in which offenders often "come in and [go] right back out." (Tr. 2627-28). As part of that argument, the prosecutor contended that cooperation agreements are a necessary evil because defendants typically do not walk in with counsel and say, "Judge, I'm guilty. I'll take the maximum. Thank you very much. Thank you for my 30 years, Your Honor. It's been a pleasure being here before you." (Id. at 2628). The prosecutor further suggested that plea bargaining "is a way of life" in New York County. (Id. at 2628-29).

   In his brief to the Appellate Division, Robert argued that these arguments were not evidence based. (Ex. G at 74-75). A prosecutor's role, however, is not limited to "parroting facts already before the jury" and can include inferences from those facts. See United States v. Wilner, 523 F.2d 68, 74 (2d Cir. 1975). Here, as the prosecutor noted in his summation, the argument that he was making was based on "Tyrone Rich's rap sheet" and the testimony of Cruz, both of whose criminal records were discussed during their testimony. (Tr. 2629). In any event, even if the prosecutor's remarks went beyond the record, "[i]f every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand." Dunlop v. United States, 165 U.S. 486, 498 (1897). Given the strength of the People's case against Robert, the

prosecutor's remarks about cooperating witnesses, even if unjustified, plainly did not deprive him of a fair trial.

Finally, Robert accurately notes that at one point during his summation, the prosecutor went beyond the limited purpose for which he had sought to introduce the nickname "Crazy Rob" by referring to Robert repeatedly by that name.  Specifically, as he was describing the Romero's arming themselves and heading across the street to Adorno's parked car, the prosecutor observed, "Robert is first, Crazy Rob," and then commented, "Crazy Rob is upset that day.  Crazy Rob is mad.  Crazy Rob is not going to be humiliated on his block."  (Tr. 2548-49).

When the use of Robert's nickname first was discussed during pretrial proceedings, Justice Snyder observed, "[i]f some witnesses say he's known by [that name], you may refer to it in summation."  (Id. at 4).  While hindsight suggests that a more nuanced ruling might have been desirable, the prosecutor mentioned Robert's nickname on only one page of a one hundred-page summation.  Moreover, the jury was fully aware of the relatively tame activities that had led to Robert being given that nickname at a young age.  In light of the overwhelming evidence that Robert was one of the shooters, it defies credulity to suggest that a handful of references to "Crazy Rob," either alone or accompanied by the prosecutor's other allegedly objectionable statements in summation, could have convinced the jury to return a guilty verdict against him in a case in which he might otherwise have been acquitted.

Robert consequently is not entitled to habeas relief on the basis of any misconduct during the course of the prosecutor's summation.

3.      Use of Bible to Swear Witnesses

Robert's Establishment Clause claim also lacks merit.  The United States Supreme Court has never held that the Establishment Clause prohibits a witness in a court of law from swearing to the truth of his testimony with his hand on a bible.  Therefore, the Appellate Division's rejection of that claim in connection with Robert's second Section 440.10 motion was neither "contrary to," nor based on "an unreasonable application of, clearly established Federal law" under 28 U.S.C. § 2254(d)(1).  To require a witness to swear on a bible, rather than simply affirming that his testimony will be truthful, might give rise to a constitutional violation, see Doe v. Phillips, 81 F.3d 1204, 1210 (2d. Cir. 1996) (citing People ex rel. McCollum v. Board of Education, 333 U.S. 203, 210-11 (1948)) ("It is well settled that a government official has no authority to require a religious act."), but it is the witness whose rights would be infringed, not the defendant in whose case the witness was called.  Thus, even if the procedure employed by the state court did give rise to a First Amendment violation, Robert would lack standing to challenge it.  See Warth v. Seldin, 422 U.S. 490, 499 (1975) ("[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.").

4.    Double Jeopardy Claim

The Petition and Robert's other papers make several references to the Double Jeopardy Clause of the Fifth Amendment.  (See Pet. at 5; Ex. A at 8; Ex. H at 8). The Double Jeopardy Clause provides that no person shall "be subject for the same offen[s]e to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  In Benton v. Maryland, 395 U.S. 784, 787 (1969), the Supreme Court held that the clause can be enforced against the states through the Fourteenth Amendment.  As the Supreme Court further noted in North Carolina v. Pearce, 395 U.S. 711 (1969), decided the same day as Benton, there are three protections afforded by the Double Jeopardy Clause:  "It protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against multiple punishments for the same offense."  Id. at 717 (footnotes omitted).

The respondent interprets Robert's double jeopardy claim to be related solely to the third protection, based on Robert's suggestion that he could be sentenced only once for the two shootings.  (See Resp't's Mem. at 62-66).  In that regard, the state statute under which Robert was sentenced is Section 70.25(2) of the New York Penal Law ("PL"), which provides that sentences must run concurrently if they relate to "two or more offenses committed through a single act or omission."  PL § 70.25(2).  The New York Court of Appeals has held that this language permits consecutive sentences to be imposed "where the crimes are committed through separate and distinct acts, even though part of a single transaction."  People v. Salcedo, 92 N.Y.2d 1019, 1021 (1998).

40

In advancing this aspect of his double jeopardy claim, Robert fails to distinguish between first and second degree murder.  Under New York law, a person can commit Murder in the First Degree in a number of ways, including the intentional killing of one person when, as part of the "same criminal transaction," the defendant intends to cause the death of "an additional" person and does so.  PL § 125.27.  Since this provision requires more than one death as an element of the crime, only a single sentence can be imposed.  See People v. Rosas, 8 N.Y.3d 493, 499-500 (2007).  In this case, however, Robert was convicted of two counts of Murder in the Second Degree, under PL § 125.25[1].  The New York Court of Appeals has long permitted consecutive sentences to be imposed pursuant to this statute when multiple deaths are caused by different shots – even if they occur as part of a single criminal transaction – because the shooting of each victim constitutes a separate criminal act and no one shooting is a material element of the other crime.  See People v. Brathwaite, 63 N.Y.2d 839, 842-43 (1984); see also Rosas, 8 N.Y.3d at 499-500 (distinguishing permissible sentences under Murder in the First Degree and Murder in the Second Degree).

Accordingly, because the consecutive sentences imposed by the trial court were allowed by state law, Robert's claim that the sentences were unduly harsh or should have run concurrently does not present a federal constitutional issue cognizable on habeas review.  See States v. Khalil, 214 F.3d 111, 117 (2d Cir. 2000) ("The Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."); White v. Keane, 969 F.2d 1381, 1383 (2d

41

Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law.").

As noted above, sentencing may not be the sole issue that Robert seeks to raise through his double jeopardy claim.  In his initial Section 440.10 motion, Robert also suggested that his second trial violated his "fundamental right not to be put twice in jeopardy."  (Ex. A at 1).  He repeated that claim in his pro se brief to the Appellate Division and further argued that the use of evidence of uncharged crimes violated the Double Jeopardy Clause.  (See Ex. H at 41, 42).  While these two additional claims were not presented to the Court of Appeals and therefore may be unexhausted, a habeas court may deny claims on the merits despite a petitioner's failure to exhaust them fully before the state courts.  See 28 U.S.C. § 2254(b)(2); see also Rhines, 544 U.S. at 277 (district court abuses its discretion by granting a petitioner a stay to exhaust meritless claims).  I will therefore address these claims briefly.

As the United States Supreme Court noted last term, "a jury's inability to reach a decision is the kind of 'manifest necessity' that permits the declaration of a mistrial and the continuation of the initial jeopardy that commenced when the jury was first impaneled."  Yeager v. United States, 129 S. Ct. 2360, 2366 (2009) (citing Arizona v. Washington, 434 U.S. 497, 505-06 (1978), and United States v. Perez, 22 U.S. 579, 580 (1824)).  Thus, the "'interest in giving the prosecution one complete opportunity to convict those who have violated its laws' justifies treating the jury's inability to reach a verdict as a nonevent that does not bar retrial."  Id. (quoting Washington, 434 U.S. at

42

509).  That is precisely what happened here.  Despite three days of deliberations and an

Allen charge, the first jury indicated that it was hopelessly deadlocked.  Contrary to

Robert's suggestion, the Double Jeopardy Clause does not proscribe a second attempt to

convict a defendant in such circumstances.  See Richardson v. United States, 468 U.S.

317, 326 (1984) ("The Government, like the defendant, is entitled to resolution of the

case by verdict from the jury, and jeopardy does not terminate when the jury is discharged

because it is unable to agree.  Regardless of the sufficiency of the evidence at petitioner's

first trial, he has no valid double jeopardy claim to prevent his retrial.").

   Finally, to the extent that Robert challenges the admission of evidence of

uncharged crimes at his trial on the theory that it constitutes a double jeopardy violation,

his claim is clearly frivolous.  Robert appears to be referring to the evidence regarding the

attempted shooting of Martinez's mother and Aponte.  (Ex. H at 42, 46).  The

prosecution, however, did not use the testimony concerning that prior crime to prove any

element of the crimes charged in this case.  It follows that the use of this evidence does

not give rise to a double jeopardy claim.  See Blockburger v. United States, 284 U.S. 299,

304 (1932).

   In sum, even if the Court reads Robert's double jeopardy claim more

broadly, Robert fails to state a constitutional violation.

IV.    Conclusion

        For the foregoing reasons, the Court should deny Robert's Petition.

Additionally, a certificate of appealability should not be issued because Robert has failed

to make the substantial showing of the denial of a constitutional right required by 28

U.S.C. § 2253(c)(2).

V.    Notice of Procedure for Filing of Objections to this Report and Recommendation

        The parties are hereby directed that if they have any objections to this

Report and Recommendation, they must, within fourteen days from today, make them in

writing, file them with the Clerk of the Court, and send copies to the chambers of the

Honorable Paul A. Crotty, United States District Judge, and to the chambers of the

undersigned, at the United States Courthouse, 500 Pearl Street, New York, NY 10007,

and to any opposing parties.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72(b).

Any requests for an extension of time for filing objections must be directed to Judge

Crotty.  Any failure to file timely objections will result in a waiver of those objections for

purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(e), 72(b).

Dated:     New York, New York
          February 2, 2010

                                  FRANK MAAS
                          United States Magistrate Judge

44

Copies to:

Robert Romero
02-A-1778
Great Meadows Correctional Facility
P.O. Box 51
Comstock, New York 12821

Susan Holly Gliner
Assistant District Attorney
Office of the New York County District Attorney
Fax:   (212) 335-9288

TS

45